**Arnold OWEN, Plaintiffs,**

**v.**

**SOUNDVIEW FINANCIAL GROUP, INC., SoundView 401(k) and Profit–Sharing Plan, Defendants.**

**No. 96 Civ. 7003(MP).**

United States District Court,
S.D. New York.

June 22, 1999.

Order Supplementing Opinion,
July 28, 1999.

Wachtel & Masyr, LLP, William B. Wachtel and John H. Reichman, of counsel, New York City, for plaintiff, Arnold Owen.

Loeb & Loeb LLP, Michael P. Zweig and Helen Gavaris, of counsel, New York City, for defendants, SoundView Financial Group, Inc., and SoundView 401(k) and Profit–Sharing Plan.

*OPINION and DECISION*

MILTON POLLACK, Senior District Judge.

This action having been tried before the Honorable Milton Pollack, United States

Senior District Judge, without a jury on March 24, 29, and 30, 1999; and this Court having received and evaluated the testimony of the witnesses at trial, the deposition testimony[1] and the documents received in evidence, and due deliberation having been had, reports the same as is required by Fed.R.Civ.P. 52(a), in its Opinion and Findings, and expresses its Conclusions as follows.

The plaintiff, Arnold Owen ("Owen"), an employee and Director of the defendant SoundView Financial Group, Inc. ("SoundView") and a participant and trustee of the SoundView 401(k) and Profit–Sharing Plan (the "Plan") elected to cause the Plan to purchase 120,000 shares of restricted SoundView common stock for the benefit of his profit-sharing account. The shares had been placed in a "Pooled Investment Fund" along with the SoundView common stock held for the benefit of other SoundView employee Plan participants. Owen withdrew from his employment with SoundView and from participation in the Plan on March 14, 1996.

The Plan provides that distributions of accounts from a Pooled Investment Fund invested in company stock shall be based on the fair market value of the participant's account on the valuation date that immediately precedes the participant's date of termination of employment. Under that formulation the relevant date for determining the value payable to plaintiff was February 29, 1996. Plaintiff demanded to be paid out at $50 per share (a wholly fictional amount). The Company countered with $5.80 per share as the fair market value, which the trustees determined was the equivalent of the discounted book value of the shares at that time. The trustees of the Plan, including the plaintiff herein, had a longstanding policy of using the book value of the common stock as the agreed fair market value of the stock and so reported quarterly and annually to the plaintiff as a Plan participant.

The plaintiff rejected the trustees determination of the fair market value of the company stock held in a Pooled Investment Fund for his benefit. Thereafter, plaintiff elevated his demand to an unspecified dollar amount described by him as the "current" fair market value of the stock and this suit followed.

### The Complaint

In or about September 1996, plaintiff Arnold Owen commenced this action against defendants SoundView Financial Group, Inc., now known as SoundView Technology Group, Inc. ("SoundView"), and the SoundView 401(k) and Profit–Sharing Plan, alleging four causes of action in his Amended Complaint.

The first cause of action seeks a declaratory judgment pursuant to 29 U.S.C. § 1132(a) declaring that Owen is entitled to be paid the *current* fair market value of the shares of SoundView stock he purchased through the SoundView 401(k) Plan, and seeks the *current* fair market value of said shares to be established through appraisal procedures set forth in

---

1. The deposition submissions consist of the following: Plaintiff submitted, prior to trial, marked excerpts from the depositions of James Townsend, Kerry Tyler, Russell D. Crabs, Richard C. May and James Mendelson. Defendants submitted, prior to trial, marked excerpts from the depositions of Arnold Owen, Kerry Tyler and James Mendelson. By letter dated March 26, 1999, plaintiff submitted cross-marked excerpts from the deposition of Arnold Owen. On the second day of trial, plaintiff submitted additional marked excerpts from the depositions of Russell D. Crabs and Kerry Tyler. At trial, defendants withdrew their deposition markings of Kerry Tyler and James Mendelson (Tr. 297), and the Court granted defendants' motion to consider the unmarked portions of the deposition transcripts of the witnesses whose deposition testimony had previously been designated, which were submitted to the Court as part of defendants' cross-examination of those witnesses. (Tr. 298). Pursuant to Rule 32(a)(4) of the Federal Rules of Civil Procedure, this Court has the inherent power and discretion to consider the full deposition transcripts of Mr. Townsend and Mr. May. *Larsen v. A.C. Carpenter, Inc.,* 620 F.Supp. 1084, 1104 (E.D.N.Y. 1985), *aff'd,* 800 F.2d 1128 (2d Cir.1986).

Section 7 of SoundView's Stock Purchase and Transfer Restriction Agreements (the "Stock Purchase Agreements"). The second cause of action seeks injunctive relief pursuant to 29 U.S.C. § 1132(a) in the form of an order directing defendants to pay Owen the *current* fair market value of his shares held by the Plan and to comply with the appraisal procedures set forth in the Stock Purchase Agreement.

Alternatively, in the third cause of action, Owen asserts that the Plan trustees breached their fiduciary duties under ERISA by acting arbitrarily and capriciously in calculating the fair market value of the highly restricted SoundView common stock held by the plan trustees in a Pooled Investment Fund for the benefit of Owen and seeks an order requiring the defendants to calculate the current fair market value of the stock in a "fair and reasonable manner." Owen's fourth cause of action asserts a claim for unjust enrichment.

*ERISA*

■ Generally, the requirements of ERISA apply to any "plan, fund, or program" established by a non-governmental employer for the purpose of providing retirement benefits to its employees. 29 U.S.C. §§ 1002(2), 1003(2). With certain limited exceptions, ERISA preempts all state and local laws that "relate" to an employee benefit plan. *See* 29 U.S.C. § 1144(a). Under this broad preemptive language, *any* state law that relates to an ERISA-covered plan is preempted, not just those laws that conflict with ERISA. *See Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 140, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990) (employee's claim was expressly preempted by ERISA § 514(a), 29 U.S.C. § 1144(a), which provides for preemption of all state laws which "relate to" an employee benefit plan covered by ERISA).

The SoundView 401(k) and Profit–Sharing Plan involved herein is an "employee pension benefit plan" that is intended to be a "qualified" "profit-sharing plan" with a "cash or deferred" feature. Owen's claims

for benefits under this Plan are governed by ERISA and the Plan documents.

*The Plan*

The Plan provides the Administrative Committee, which consists of the trustees, with "the power, to be exercised in its complete discretion, ... [t]o construe all terms, provisions, conditions and limitations of the Plan." The Plan also vests in the trustees exclusive authority to determine the fair market value of the assets held by the Plan's Profit–Sharing Trust.

Consistent with the terms of the Plan Document, following Owen's departure from SoundView in March 1996, the SoundView stock held by the Plan on Owen's behalf was valued as of February 29, 1996, the month-end prior to his departure, and Owen was notified by the Plan that he would receive his vested interest in the stock, the amount of $5.80 per share, or $696,000 in total. Owen argues that this figure does not represent the fair market value of SoundView stock and alleges that the trustees breached their fiduciary duties by calculating the value of the stock based on its discounted book value.

*Plan Trustees' Fiduciary Duties*

ERISA sets forth the general fiduciary duties of Plan trustees, in 29 U.S.C. § 1104(a)(1), which provides in relevant part,

> a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A) for the exclusive purpose of:
>
> (i) providing benefits to participants and their beneficiaries; and
>
> (ii) defraying reasonable expenses of administering the plan;
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

. . .

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter. . . .

■ The Plan trustees' determination of the value of the SoundView stock held in a Pooled Investment Fund for the benefit of Owen's Plan account was reasonable and is entitled to the deference of this court. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 111, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) ("Trust principles make a deferential standard of review appropriate when a trustee exercises discretionary powers"). The trustees have consistently determined that the book value of SoundView from time to time is the most appropriate measure of the value of SoundView stock for the purpose of determining benefit distributions. In making this determination, the trustees took into account, among other things, the available market for the stock, general industry practices, as well as market conditions. In addition, however, the trustees have compared independent valuations of the SoundView stock prepared by Valuemetrics, an independent valuation firm hired by the plaintiff during his tenure as a Plan trustee, in making benefit determinations. Although those valuations did not rely on the book value of SoundView, they did conform closely to the book value of SoundView as determined by trustees and thereby supported the Plan trustees' valuation method in this circumstance.[2]

The evidence adduced at trial does not reveal a breach of the aforementioned fiduciary duties on the part of any of the Plan trustees, with the notable exception of Owen, who took great pains to prove that he was a faithless fiduciary of the Plan and SoundView. His testimony, if it is to be credited at all, revealed a consistent and brazen abdication of the fiduciary duties owed an ERISA plan by a trustee: according to Owen, he never attended a meeting of the trustees, never discussed his duties as a trustee with anyone, signed documents without reading them and took no responsibility whatsoever to change a policy which he enforced as a Plan trustee, and now claims, in his own self-interest, is violative of ERISA. His self-interested assertion that he was somehow "excluded" by the other trustees from the administration of the Plan merely impressed the Court that he was not worthy of belief. For Mr. Owen to seek equity from this Court is not only improper, but astonishing. *See, e.g., Anweiler v. American Elec. Power Service Corp.,* 3 F.3d 986, 993 (7th Cir.1993); *Schaefer v. Arkansas Med. Soc'y,* 853 F.2d 1487, 1493 (8th Cir.1988); *Ellenburg v. Brockway, Inc.,* 763 F.2d 1091, 1097 (9th Cir.1985).

The Court holds that the plaintiff has failed to prove that he is entitled to be cashed out other than $5.80 per share and his refusal to receive such payment in satisfaction of his stock interests negates any obligation of SoundView to pay interest on the amount thereby due him; SoundView has been ready and willing and is directed by Order of this Court to pay him accordingly. His four causes of action are disposed of accordingly.

### Additional Specific Findings

Annexed hereto are the Court's Additional Specific Findings and Conclusions of Law herein.

### Background

1. SoundView is a Delaware corporation with its principal place of business in

---

**2.** ERISA case law uniformly holds that appraisals are useful, but not dispositive, of valuation decisions that must be made by plan fiduciaries. *See, e.g., Donovan v. Bierwirth,* 680 F.2d 263, 272 (2d Cir.1982) (following independent expert advice, without further inquiry into the prudence of a transaction, will not "whitewash" the trustees' lack of an investigation); *Howard v. Shay,* 100 F.3d 1484, 1489 (9th Cir.1996), *cert. denied,* 520 U.S. 1237, 117 S.Ct. 1838, 137 L.Ed.2d 1042 (1997) (fiduciaries cannot blindly rely on appraisal provided by Big Eight accounting firm and must make certain that reliance on the expert's advice is justified under the circumstances).

Stamford, Connecticut. *Stipulated Fact No. 1.* SoundView is a small, privately held, registered broker-dealer specializing in technology stocks. When Owen joined SoundView in 1991, SoundView employed approximately 30 individuals and currently employs approximately 150 persons. *Stipulated Fact No. 2.*

2. Owen is an experienced, sophisticated business person and stock trader, having spent most of his professional life, beginning in 1976, in the securities industry. Owen *Tr. at 48–49, 95; Owen Dep. at 7–10.*

3. From 1979 until his termination in December 1990, Owen was employed at Salomon Brothers involved with institutional sales trading. *Stipulated Fact No. 5; Owen Tr. at 95–96.*

4. On or about February 15, 1991, Owen accepted SoundView's offer of employment and commenced employment as Vice President of Trading shortly thereafter. *Stipulated Fact No. 3; Def.Ex. 1.* Owen's responsibilities at SoundView included being in charge of trading stocks in the over-the-counter and listed equity areas. *Stipulated Fact No. 4.*

5. The opportunity to join a small, growing firm like SoundView, as well as the opportunity to play a significant role in SoundView's management, were significant considerations in Owen's decision to accept employment at SoundView. *Owen Tr. at 99–100; Owen Dep. at 21–24.*

6. Prior to Owen's acceptance of SoundView's job offer, James Townsend, SoundView's then-acting President and CEO, told Owen, among other things, that if he joined the firm Owen would be given the opportunity (i) to participate in the firm's management as a member of SoundView's Executive and Operating Committees, and later as a member of the Board of Directors, and (ii) to purchase shares of SoundView common stock at book value. *Owen Tr. at 50–51; Owen Dep. at 18–20, 25, 36–39; Townsend Dep. at 55–61.* Townsend also told Owen that SoundView had a policy and practice of repurchasing

such stock from departing employees at book value. *Townsend Dep. at 60–61.* While Owen testified that he could not say with certainty that such a discussion did or did not take place *(Owen Tr. at 103–104),* it seems more likely than not that such information would, under the circumstances, have been communicated to Owen. Owen also knew at the time he joined SoundView that SoundView's stock was not traded on any public market. *Owen Tr. at 105.* The absence of a public market for the stock was not a consideration for Owen at the time because, as Owen testified, "I was buying, not selling." *Owen Tr. at 106; Owen Dep. at 43–45.*

7. Owen's testimony *(Owen Tr. at 61–65)* that he was unaware at the time he joined SoundView of its policy of repurchasing stock at adjusted book value is not credible. Owen knew that his employment was on an at-will basis and that a termination (and hence stock repurchase) could come at any time. *Owen Tr. at 100–101.* Owen's background as a stock trader, in which he was involved every day in purchase and sales transactions *(Owen Tr. at 95–96, 105)* and his awareness that there was no outside market for the stock, would have led any person, but especially Owen, to ascertain how and at what price the stock would be repurchased.

### Owen's Role as a Member of SoundView's Senior Management and a Plan Trustee

8. After joining SoundView as Vice President of Trading, Owen became a member of SoundView's senior management group and a member of SoundView's five-member Executive and Operating Committees. *Owen Tr. at 87.* Owen was also one of five members of SoundView's Board of Directors from approximately August, 1992 through the cessation of his employment in March, 1996. *Stipulated Fact No. 20.: Def.Ex. 26; Owen Dep. at 48.* Together with four other senior SoundView executives (James Townsend, Russell D. Crabs,

Steven Cohen and Steve Zucker), Owen ran the company. *Owen Tr. at 99–100.*

9. During Owen's tenure with Sound-View, there were only 10–12 senior executives (informally referred to internally at SoundView as "partners") who participated in monthly "partners' meetings" at which day-to-day management and operational issues were discussed. *Stipulated Fact No. 21; Tyler Tr. at 273–274.* As the Managing Director of Trading in charge of SoundView's institutional equity trading *(Owen Dep. at 48),* Owen attended and participated in these meetings. *Stipulated Fact No. 21; Owen Tr. at 74, 139–141.*

10. Together with other senior executives of SoundView (James Townsend, Russell Crabs, Steven Cohen and Steven Zucker), Owen served as a trustee of the Plan from 1992 to 1996. *Def.Ex. 7 (at p. 31); Stipulated Fact No. 18; Owen Tr. at 71, 88.*

### Owen's Purchase of SoundView Stock Through The Plan

11. A 401(k) and Profit–Sharing Plan was established by SoundView, effective April 1, 1991. *Stipulated Fact No. 6.* The Plan is a defined contribution plan. The contributions into the Plan's Profit–Sharing Trust consist of amounts voluntarily withheld by SoundView from the employee's payroll *(i.e.,* 401(k) contributions), employer matching contributions, and discretionary employer profit-sharing contributions. *Def.Exs. 5 (§§ 3.1, 3.2 & 3.3 at pp. 18–20), 6 (Q & A Nos. 2, 4 & 5), & 8 (Fourth Resolution at pp. 1–2.).*

12. All Plan participants were permitted to have their 401(k) profit-sharing account balances invested in various mutual funds and many Plan participants, including Owen, were permitted at specified times to purchase SoundView common stock through their Plan accounts. *Stipulated Fact No. 8.*

13. Employees, including Owen, were offered the option of purchasing SoundView common stock by three different means: (1) individually, for cash; (ii) individually,

through a secured promissory note; or (iii) through the Profit–Sharing Trust with 401(k) funds. *Def.Exs. 9 (cover sheet), 11, 12 & 39; Pl.Ex. 23; Owen Tr. at 106–107; Tyler Tr. at 222–223.*

14. SoundView provided a packet of material to employees outlining the three different ways in which the SoundView stock could be purchased, which included: (i) a "Cover Sheet," which specified the number of shares offered and available to be purchased and indicated, by employee election, whether the shares were being purchased through the Profit–Sharing Trust or were being purchased by the employee outright, either for cash or financed via a secured promissory note; (ii) the General Provisions of the Stock Purchase Agreement, which governed purchases of Sound-View stock by employees outright, *i.e.,* shares purchased for cash or financed via a promissory note; and (iii) other collateral documents. *Tyler Tr. at 222–224; Def. Exs. 9 (General Provision No. 2), 11, 12 & 39; Pl.Ex. 23;*

15. Prior to or simultaneous with their purchase of SoundView stock through the Plan, employees were also given copies of SoundView's written 401(k) and Profit–Sharing Plan (the "Plan Document"), SoundView's 401(k) and Profit–Sharing Plan Trust Agreement (the "Trust Agreement"), and a Summary Plan Description, all which set forth the terms and conditions governing participation in the Plan. *Tyler Tr. at 222–225; Def.Exs. 5, 6, 7, 40 & 41.*

16. In addition to the Plan Document and the Summary Plan Description, employees were given various enrollment forms, all of which were required be filled out in the event the employee elected to participate in the Plan and to invest in SoundView stock. *Tyler Tr. at 224–225, Def.Exs. 2–4.*

17. The Plan Document *(Def.Ex. 5),* the Trust Agreement *(Def.Ex. 7),* the Summary Plan Descriptions *(Def.Exs. 6, 40 & 41)* and the enrollment forms *(Def.Ex. 4, p. 2)* address various issues affecting the

312

Plan participant's benefits and rights under the Plan, including the valuation and distribution of the SoundView stock purchased through the Profit–Sharing Trust.

18. Owen received and reviewed a copy of the Plan Document and the Trust Agreement in or about April, 1991. *Def.Exs. 6, 40, 41 & 7; Stipulated Fact Nos. 9 & 11; Owen Tr. at 115; Owen Dep. at 112.*

19. Owen received and filled out various enrollment forms necessary for his participation in the Plan, including a SoundView 401(k) and Profit–Sharing Plan enrollment form, a beneficiary designation form, and a pay conversion election form. *Stipulated Fact No. 12., Def.Exs. 2, 3 and 4; Owen Tr. at 112–116.*

20. The Plan Document *(Def.Ex. 5, at § 10)* required the establishment of a trust fund to receive the contributions from Plan participants. The Trust Agreement was executed as of April 1, 1991 by Owen, who signed it along with others as a trustee. *Def.Ex. 7 at pp. 30–31; Owen Tr. at 88.* The Trust Agreement *(Def.Ex. 7 at pp. 2, 16),* among other things, required the Plan trustees to hold all of the assets delivered to them "in accordance with the Plan [Document]" and to discharge their responsibilities "in accordance with the provisions of the Plan [Document]."

21. On or about April 30, 1991, Owen elected to cause the Plan to acquire for his 401(k) profit-sharing plan account 60,000 shares of SoundView common stock. These shares were purchased at the then-prevailing book value ($1.53 per share). *Stipulated Fact No. 13.* On or about August 31, 1991, Owen elected to cause the Plan to acquire for his 401(k) profit-sharing plan account 55,000 shares of Sound-View common stock. These shares were purchased at the then-prevailing book value ($1.65 per share). *Stipulated Fact No. 14.* On or about September 30, 1992, Owen elected to cause his Plan to acquire for his 401(k) profit-sharing account 5,000 shares of SoundView common stock. These shares were purchased at the then-prevailing book value ($1.73 per share).

*Stipulated Fact No. 15.* In total, 120,000 SoundView shares were purchased through Owen's Plan for the benefit of Owen's profit-sharing account at a cost of $191,200. *Stipulated Fact No. 16.* The 120,000 shares of SoundView common stock held by the Plan on Owen's behalf were registered in the name of the Plan trustees *(Stipulated Fact No. 17)* and were held by the Plan trustees. *Tyler Tr. at 231–233.* Owen never had physical possession of any stock certificate. *Tyler Tr. at 233; Owen Tr. at 108.*

22. Attached as "Exhibit A" to the April 30, 1991 Cover Sheet signed by Owen were copies of Sections 7 and 8 of Article VI of SoundView's by-laws, which contain broad restrictions governing the transferability of SoundView's stock. *Def.Ex. 9 (Exhibit A); Stipulated Fact No. 34.* Pursuant to Sections 7 and 8 of Article VI of Sound-View's by-laws, a shareholder of Sound-View may only transfer shares of common stock to one of the following: (a) to Sound-View; (b) to another shareholder of SoundView, subject to SoundView's right of first refusal to repurchase the shares on the same terms as the shareholder has proposed; (c) to another person by gift or bequest, provided each transferee agrees in writing to be bound by the transfer restrictions; (d) to one who acquires of all the outstanding shares of common stock in connection with a merger, consolidation, or similar change-of-control transaction; or (e) to another person after the shares of common stock have become registered pursuant to Section 12 of the Securities Exchange Act of 1934, as amended. *Def. Ex. 9 (Exhibit A).* Owen received this by-law at the time he purchased SoundView shares. *Def.Ex. 9; Owen Tr. at 110–12.*

23. There is no written contract or agreement between SoundView and the Plan requiring SoundView to repurchase Sound-View stock held in the Plan by the trustees at any specific price or value. *Stipulated Fact No. 36.*

24. Owen chose to purchase the stock through the Plan, as opposed to outright, because, among other reasons, it was advantageous to him tax wise (*i.e.,* the appreciation in the value of the SoundView stock was tax-deferred until his retirement). *Owen Dep. at 247–248; Owen Tr. at 57–58, 107–108.* While Owen did not have the cash with which to make the purchase, he was able to "rollover" the 401(k) funds he had accumulated with his previous employer in order to make the stock purchases. At the time, Owen did not have cash available to make a purchase of 120,000 shares of SoundView stock. *Owen Tr. at 106–107.*

### The Trustees' Retention of Valuemetrics, Inc.

25. Beginning in or about 1993, the Plan trustees, including Owen, began the practice of obtaining annual valuations of SoundView from an independent, outside appraisal company called Valuemetrics, Inc. ("Valuemetrics"). *Def.Exs. 34, 35, 36, 37 & 44; Crabs Tr. at 43; Tyler Tr. at 258–259.* Owen's testimony that, until discovery in this action, he never knew that SoundView and the Plan retained Valuemetrics for the purpose of obtaining independent valuations is not credited. Owen knew of SoundView's retention of Valuemetrics at the inception thereof because Owen was the only trustee to sign the March 16, 1993 Valuemetrics Service Agreement on behalf of the Plan. *Def.Exs. 43 (Paragraph 22), 44; Owen Tr. at 143–52.*

26. In order to insure that Valuemetrics understood SoundView's business and financial information, the Plan trustees reviewed, for accuracy and completeness, the draft reports and final reports produced by Valuemetrics. *Crabs Tr. at 208–210; Tyler Tr. at 238–241.*

27. The Valuemetrics reports were obtained by the 401(k) trustees to provide additional information and guidance to the trustees in determining the fair market value of SoundView's stock. *Tyler Tr. at 258–259; Crabs Dep. at 55.*

28. In or about August 1992, Owen became a member of the SoundView Board of Directors. *Owen Tr. 127.*

29. On February 4, 1993, SoundView's Board of Directors, including Owen, adopted resolutions (the "Resolutions") which, in relevant part, provided that (i) fair market value of SoundView stock for calculating sales and repurchases of SoundView stock would be considered book value; and (ii) the SoundView Operating Committee was empowered to reacquire such shares at a price above book value.

30. The Resolution reads (in relevant part) as follows:

> RESOLVED, that the fair market value per share used to determine the price per share at or above which the Corporation will repurchase or reacquire its issued and outstanding common stock from its shareholders shall be the book value per share as at the end of the month preceding the repurchase, provided that the calculation of book value shall assume the exercise of all outstanding options for the purchase of the Corporation's common stock, at their respective exercise prices.

*Def.Ex. 19.* This Resolution confirmed SoundView's practice and policy.

31. Since 1992, the Valuemetrics' reports have generally reflected and confirmed a valuation of SoundView stock on a per share basis that is close (*i.e.,* sometimes slightly below or slightly above) to the computed "book value" formulation utilized by SoundView and the Plan, as summarized below:

| Date: | 12/31/92 | 12/31/93 | 12/31/94 | 12/31/95 |
|---|---|---|---|---|
| Book Value: | $2.56 | $2.64 | $3.48 | $5.54 |
| Valuemetrics: | $1.67 | $3.19 | $4.64 | $7.05 |

*See Def.Exs. 23* (reflecting the Book Value of stock held by the Plan as of the aforementioned dates), *34 (at p. 2). 35 (at p. 2), 36 (at p. 2) & 37 (at p. 3)* (reflecting the value assigned to such stock by Valuemetrics).

32. The Plan trustees relied upon the annual appraisal reports issued by Valuemetrics for 1992, 1993 and 1994 as one of several factors supporting their judgment that the then-current book value being offered and paid by the Plan, which Owen was notified he would receive, was a reasonable reflection of the stock's fair market value. *Tyler Tr. at 229–230, 258; Crabs Dep. at 55.*

### The Practices and Policies of SoundView and the Plan With Respect to Stock Repurchases

33. After executing the Trust Agreement, Owen served as a Plan trustee throughout the course of his employment at SoundView. *Stipulated Fact No. 18; Owen Tr. at 71.* Owen also served as a member of SoundView's Board of Directors from approximately August 1992 through the cessation of his employment in March, 1996. *Stipulated Fact 20.*

34. The consistent, declared and open practice of both SoundView and the Plan prior, during Owen's employment has been to sell shares of SoundView common stock to employees (both through the Plan and by individual purchase) at fair market value based upon the then-prevailing (adjusted) book value, and to repurchase such shares from departing employees at fair market value based upon the then-prevailing book value. *See Stipulated Facts Nos. 22, 23, 24, 25, 26, 27, 28, 29, & 30; Def.Exs. 18, 19, 20, 21, & 42; Crabs Tr. at 21; Tyler Tr. at 230–231, 271–273.*

35. During Owen's tenure as a senior executive of SoundView, as a member of the Board of Directors and as a trustee of the Plan, Owen knew and expressly approved of SoundView's and the Plan's book value policy, and knew and expressly approved of the Plan trustees' judgment and conclusion that the fair market value of SoundView stock was a reasonable estimate of its then-current book value. *Stipulated Facts Nos. 22, 23, 24, 25, 26, 27, 28, 29, 30, & 31; Def.Exs. 1, 13, (at ¶ 5), 14 (at ¶ 5), 15 (at ¶ 5), 18, 19, 20, 23, 24 & 42; Tyler*

*Tr. at 234–236; Owen Tr. at 85–92; 125–127; Townsend Dep. at 60–61.*

36. Owen's insistence that he did not learn of SoundView's policy and practice of repurchasing stock from departing employees at adjusted book value until the February 4, 1993 Board of Directors meeting *(Owen Tr. at 65)* is not credited. Among other things, Owen was told about SoundView's policy and practice of repurchasing stock from departing employees at book value even before he joined SoundView *(see* Finding No. 6, *supra* ), and Owen admitted on cross-examination that he attended a SoundView Board of Directors meeting on February 20, 1992 in which the discussion specifically centered on how much of a premium would have to be paid over the book value price normally paid to repurchase SoundView stock, so that a block of stock held by outside investors could be reacquired by SoundView. *Owen Tr. at 125–127; Def.Ex. 18.*

37. During Owen's tenure at SoundView, there was only one instance in which the Board of Directors of SoundView (including Owen) exercised its discretion to repurchase stock from a departing employee shareholder at a sum slightly higher than the then-prevailing book value. In that one instance, the departing executive was paid a sum slightly higher than the then-current book value to compensate the executive for the value to SoundView of a transaction initiated by the executive prior to his departure from SoundView, but not reflected in SoundView's book value at the time of the executive's departure. *Def.Ex. 20; Owen Tr. at 68–69; Stipulated Fact No. 25.* Owen approved and voted in favor of this exception being made. *Id.*

38. With the exception noted above, during Owen's tenure, SoundView did not pay any departing employee shareholder more than the then-prevailing book value for the repurchase of SoundView stock. *Stipulated Fact No. 26.*

39. During Owen's employment at SoundView, every one of the other ten employees

who departed from SoundView who held their shares of SoundView common stock through the Plan had their stock repurchased from the Plan by SoundView at the then-prevailing book value. *Stipulated Fact No. 30.*

40. During his employment at Sound-View, Owen was aware that some departing employees were paid the then-prevailing book value for the shares of SoundView common stock held on their behalf in the Plan and for shares held individually (*i.e.,* outside the Plan). *Stipulated Fact No. 28.* Acting as trustee, Owen signed the 401(k) trust fund check used in November, 1994 to repurchase stock at adjusted book value from the Plan for the benefit of Sean McDonald, a departing SoundView employee who had elected to cause the Plan to purchase SoundView stock for the benefit of his profit-sharing account in the Plan. *Def. Ex. 42; Tyler Tr. at 234–236; Owen Tr. at 132–138.*

41. Owen never questioned SoundView's practice and policy of basing Plan benefits for SoundView stock held by the trustees for the beneficiaries' benefit on the then-prevailing book value. *Stipulated Fact No. 29.*

42. As a trustee of the Plan, Owen never protested or objected to the payment to departing employees of fair market value based on the then-prevailing book value for their SoundView stock when such stock was repurchased from the Plan by Sound-View on their behalf. *Owen Tr. at 159–160.* At *no* time did Owen ever tell any other Plan participant that he did not consider the book value of SoundView stock to be its fair market value for purposes of Plan distributions. *Id.*

43. Owen knew and never questioned or objected to the fact that the SoundView stock held by the Plan trustees on his behalf, as well as on behalf of the other Plan participants, was being valued by the Plan based upon the then-prevailing book value. *Owen Tr. at 76.* Shortly before leaving SoundView, Owen told a Sound-View employee, James Mendelson, during a dinner conversation, in words or substance, that "he would be damned if he would be stuck at book value" with respect to the shares of common stock held by the Plan on his behalf. *Stipulated Fact No. 32.* This statement evidenced Owen's prior awareness of the "book value" policy and his intention to avoid its application to him.

44. A reasonable inference may be drawn from Owen's own testimony that Owen believed that SoundView's policies should apply to shareholders holding a small number of shares, but not to shareholders, such as himself, who held substantial shares of stock. *Owen Tr. at 133.*

### The Account Balance Statements Regularly Sent to and Received by Owen Reflected the Plan's Valuation of SoundView Stock at Adjusted Book Value

45. From 1991 through his departure in March 1996, Owen received both annual and quarterly statements from the Plan, called "Statements of Participant's Account Balance." *Def.Ex. 23.* These statements valued the stock held on Owen's behalf in the Plan at the then-prevailing book value. *Stipulated Fact No. 31; Def. Ex. 23.*

46. A cover memorandum accompanying the annual and quarterly statements which was sent to all Plan participants, including Owen, specifically stated that "[t]he appreciation in the value of the SoundView stock represents the increase in book value of the stock from your date of purchase." *Def.Ex. 24.* That memorandum also asked Plan participants with any questions to speak with SoundView's then Vice President of Finance, Kerry Tyler. *Def.Ex. 24; Owen Tr. at 154–155.*

47. At no time during his employment did Owen protest or voice any objection to the Plan trustees, or to SoundView, concerning the content of any of the quarterly or annual statements which he received from

the Plan. *Owen Tr. at 76, 154–157; Tyler Tr. at 225–229.*

48. In addition to Owen's admitted receipt of quarterly and annual Account Balance Statements from the Plan, Kerry Tyler, SoundView's then Vice President of Finance, specifically reviewed and discussed with Owen the content of one of his Account Balance Statements, explaining to Owen that the shares held in the Plan on his behalf were being valued at fair market value based on the then-prevailing book value. *Tyler Tr. at 227–228; 244–246.*

49. Owen did not, either in his discussion with Kerry Tyler or at any other time, protest, question, or otherwise object to the Plan's fair market valuation of his SoundView stock based on the then-prevailing book value. *Tyler Tr. at 227–229; Owen Tr. at 155–157.*

50. Owen admitted that what was shown as vested on the Exhibit 23 statements was what was payable to him should he leave the company. *Owen Tr. at 157.*

### The Trustees Of The Plan Hold The SoundView Stock In A Pooled Investment Fund Which Requires Cash Distributions Valued As Of The Date Of Departure

51. Section 4.2 of the Plan Document provides that the Plan trustees may invest all the contributions received from the Plan participants comprising the 401(k) trust fund "in one or more Pooled Investment Funds or to subdivide it into Individual Investment Funds, or both . . ." *Def.Ex. 5 (§ 4.2 at p. 32).*

52. Article Fourth(e) of the Trust Agreement signed by Owen similarly provides that the trustees may direct that the trust fund "be subdivided into two or more Individual Investment Funds, one or more Pooled Investments, or both. . . ." *Def.Ex. 7 (Article Fourth (e) at p. 5).*

53. The investments in SoundView stock made by the Plan on behalf of all Plan participants were subdivided and are held by the Plan trustees in a Pooled Invest-

ment Fund. *Crabs Tr. 27; Tyler Tr. 232–234, 264–265.* The trustees held the stock registered in their name, not in the name of any individual Plan participant. *Id.: Def.Ex. 16.*

54. Section 9.2.2 of the Plan Document provides that "[a]ll distributions from Pooled Investment Funds shall be paid in cash." *Def.Ex. 5 (§ 9.2.2 at p. 59).*

55. Section 9.5 of the Plan Document provides that "distributions of Accounts from a Pooled Investment Fund invested in Company stock shall be based on the Valuation Date that immediately precedes the Participant's termination of employment." *Def.Ex. 5 (§ 9.5 at p. 63).* The "Valuation Date" for a Pooled Investment Fund invested in Company stock is defined, under Section 1.38 of the Plan Document, as the last day of each calendar month. *Def.Ex. 5 (§ 1.38 at p. 11).*

56. The Summary Plan Description, which was distributed to all Plan Participants (including Owen), is the primary document used to communicate the terms of the Plan to Plan participants. This document provides that the value of SoundView stock will be determined as of the month-end prior to an employee's departure from SoundView and shall be paid in cash:

> If your account(s) are invested in Company stock, the value of that stock will be determined as of the last day of the month before you leave the Company, and will be paid to you in cash.

*See Def.Ex. 6 (Q & A 13 pp. 10–11); Def. Ex. 40 (Q & A 13, pp. 14–15); Def.Ex. 41 (Q & A 13, pp. 10–11).*

### The Trustees' Valuation of the SoundView stock held by the Plan on Owen's Behalf

57. Section 11.2 of the Plan Document provides the Administrative Committee with "the power, to be exercised in its complete discretion, . . . [t]o construe all terms, provisions, conditions and limita-

tions of the Plan." *Def.Ex. 5 (§ 11.2 at pp. 73–74).*

58. Section 4.4 of the Plan Document vests in the Plan trustees exclusive authority to determine the fair market value of the assets held by the Plan's Profit–Sharing Trust. *Def.Ex. 5 (§ 4.4 at p. 35).*

59. On March 14, 1996, Owen resigned from SoundView. *Def.Ex. 29.* Thus, the "Valuation Date" for purposes for his benefit distribution under the Plan is February 29, 1996, the month-end prior to Owen's departure from SoundView. *See Def.Ex. 5 (§§ 9.5 and 1.38).*

60. Following the Plan's policy and practice throughout the course of Owen's five-year tenure as Plan trustee and as a senior executive of SoundView, the stock held by the Plan on Owen's behalf was valued upon Owen's departure in the same manner as it had been valued for *all* prior Plan participants during Owen's trusteeship. Owen was sent a Statement of Participant Balance showing the valuation of his stock at the adjusted book value. *Def.Ex. 32 (second page).* The stock held by the Plan for Owen's benefit was valued at $5.80 per share, or $696,000. *Id., Tyler Tr. at 228–229.* This represented a 364% increase in value since Owen's initial stock purchases through the Plan.

61. The trustees of the Plan never needed to formally meet each time that an employee tendered his or her resignation because the value of all SoundView stock held through the Plan was, as a matter of regular practice, recomputed at the end of every month. *Tyler Tr. 272–273.* Owen, a trustee for over five years, may not now complain about the absence of a formal trustee meeting to value his stock or the absence of formalities as to any other Plan matter. Owen's stock valuation was done in the same manner as for every one of the employees Owen oversaw. Trustee matters were discussed, as needed, at partners meetings. *Id.* Moreover, Owen himself admitted that he paid no attention to Plan "formalities" including whether the check he was being asked to approve and sign

was drawn on the 401(k) trust fund or SoundView. *Owen Tr. at 136.*

62. The adjusted book value of SoundView common stock, on a per share basis, was determined by a two step process. First, the book value of the entire company is computed and then the book value per share is calculated. The "book value" of SoundView is equal to the sum of shareholders' equity (the historic investment of shareholders in SoundView—amounts paid for common stock and paid-in capital— added to SoundView's retained earnings), plus the amount which SoundView would receive assuming the exercise of all outstanding (vested and not vested) stock options, which sum is then reduced by all amounts paid by SoundView for the purchase or repurchase of its own stock (treasury stock) and by the amount of secured promissory notes that were secured by shares in the Plan. Next, the "book value" per share is determined by dividing SoundView's book value (as established pursuant to the preceding sentence) by the sum of the total number of SoundView's issued and outstanding common shares, plus the number of shares which would be issued assuming the exercise of all outstanding (vested and not vested) stock options. *Tyler Tr. at 229.*

63. No credible evidence was adduced by Owen to show that the Plan trustees acted improperly or unreasonably in valuing the SoundView stock held by the Plan for the benefit of Owen based upon the adjusted book value methodology. The Plan trustees made the judgment to employ the adjusted book value methodology based upon a number of factors, including:

(1) that there was an inherent and fundamental fairness to Plan participants in having both sales and repurchases of SoundView stock be consistently determined based upon a predictable, relatively straight forward and readily calculable methodology;

(2) that the valuation by an independent appraiser (Valuemetrics) retained by the

Plan trustees had confirmed in previous years that the adjusted book value of SoundView remained in the same general range of value as the valuations provided by Valuemetrics; and

(3) that there were factors unique to SoundView, such as its (a) small size and capitalization, (b) its dependence on a relatively small number of key employees who were not bound by long-term contacts, (c) the highly speculative and volatile nature of SoundView's business (specializing in the narrow niche of information technology stocks), and (d) the highly restricted and illiquid nature of SoundView's stock and the absence of any market, other than SoundView itself, for the repurchase of stock, which warranted the modest differences in recent years between the Valuemetrics estimates and the estimates based upon the adjusted book value methodology. *Tyler Tr. at 229–230; Townsend Dep. at 174–176, 279–280; Crabs Dep. at 69–72.*

### Owen's Rejection of the Cash Distribution Tendered by the Plan Trustees

64. In the years 1991 through 1995, Owen received the following compensation from SoundView:

| YEAR | SALARY | BONUS | TOTAL |
|---|---|---|---|
| 1991 (partial year) | $109,000.00 | $ 54,500.00 | $ 163,500.00 |
| 1992 | $120,000.00 | $299,738.37 | $ 419,738.37 |
| 1993 | $120,000.00 | $193,566.00 | $ 313,556.00 |
| 1994 | $120,000.00 | $492,469.00 | $ 672,469.00 |
| 1995 | $120,000.00 | $537,935.26 | $ 657,935.26 |
| 1996 (through 3/4/96) | $ 25,714.29 | $534,582.35 | $ 560,696.64 |
| Total: | | | $2,787,895.27 |

*Def.Ex. 17; Owen, Tr. 97–98.*

65. The first time that Owen communicated to SoundView and/or to the trustees of the Plan that he did not consider the adjusted book value of the stock to be an appropriate measure of its fair market value was after he had received his bonus for 1995 of $534.582.35 and following his departure from SoundView in March 1996. *Owen Tr. at 97–98; Tyler Tr. at 227–228; Def.Exs. 30 & 33.*

66. By letter dated March 27, 1996, Owen asserted that the SoundView stock held by the Plan on his behalf was worth approximately ten times its calculated fair market value, or $50.00 a share. *Def.Ex. 30.* Owen's demand was rejected and Owen thereafter commenced this action seeking, among other things, no less than $50.00 a share for the SoundView stock held by the Plan for his benefit. *Amended Complaint ¶ 19.*

### Owen's Contention That The Stock Purchase Agreement Controls Is Without Merit

67. Owen's contention that the SoundView stock he acquired through the Plan must be valued pursuant to the appraisal procedures contained in the Stock Purchase Agreement is without merit. The documentary evidence (the Plan Document, the Trust Agreement, the Enrollment Forms and the Summary Plan Descriptions; *Def.Exs. 5, 7, 2, 3, 4, 6, 40 & 41)* contradict Owen's contention that the Stock Purchase Agreement governs the terms of repurchase of his 120,000 shares of SoundView stock held through the Plan. Even if there were any ambiguity in the documents—which Owen has not shown—no credible evidence was presented by Owen to show that he, SoundView or the Plan intended for the stock purchased through the Plan to be governed by the Stock Purchase Agreements. The documentary evidence, including Plan documents and records and the quarterly and annual Account Balance Statements received by Owen from the Plan, unequivocally proves that such stock was held in the Plan and governed by the Plan-related documents.

68. Owen was not even certain that he saw a copy of the Stock Purchase Agreement prior to directing the Plan trustees to purchase the SoundView stock for his Plan account. *Owen Dep. at 222.* Even if he had seen a copy of the Stock Purchase Agreement, Owen was not certain whether he read the Agreement and, in particular, paragraph 7 thereof, before he signed the April 30, 1991 Cover Sheet directing the stock purchases through the Plan. *Owen*

*Tr. at 111–112.* He did not speak to anyone at SoundView about the contents of the Stock Purchase Agreement before he signed the April 30, 1991 Cover Sheet, *Owen Dep. at 140–142; Owen Tr. 112,* and does not claim to have been misled by anything communicated to him by SoundView.

69. Owen admitted at trial that he intended to and did cause the Plan trustees to purchase the stock through the Plan and would not have been able to purchase the stock for cash, without utilizing the rollover funds he held in the Plan:

> Q: You were given a choice by SoundView as to what funds you could use to purchase SoundView stock, isn't that right?
>
> A: That is correct.
>
> Q: What were the choices you were given, Mr. Owen?
>
> A: Cash, credit or through my 401(k).
>
> Q: 3 choices, correct?
>
> A: Correct.
>
> Q: Now, no one at SoundView pressured you to buy through the Plan, did they?
>
> A: No, they didn't.
>
> Q: It was something you did on your own volition, correct?
>
> A: I think I testified that is where I had most of my money at the time.
>
> Q: Indeed, you made the choice to buy through the Plan because it was advantageous to you tax-wise, isn't that right?
>
> A: Actually, the most important factor is that is where my money was. I couldn't purchase the stock outright when I joined SoundView.

*Owen Tr. at 106–107; Owen Tr. at 57–58.*

70. As a Plan trustee from the inception of the Plan through the date of his departure from SoundView in March of 1996, Owen is charged with the knowledge that the Stock Purchase Agreement applied only to stock purchases outside the Plan.

His testimony *(Owen Tr. at 59–65)* that he was "never told" by anyone at SoundView that the Plan documents governed his purchases is simply incredible, in the face of the overwhelming documentary record and his own retention of the Valuemetrics firm for the very purpose of "providing an opinion as to the valuation of the fair market value . . . of the common stock . . . upon which valuation the Trustee may rely in establishing the price for purchases and redemptions by the Trust of the common stock of [SoundView]." *Def.Ex. 44.*

71. Owen is charged with the knowledge that the Cover Sheet attached to the Stock Purchase Agreement was a standard form that SoundView gave to its employees to allow them to designate their form of purchase, *i.e.,* a purchase of stock outright with cash or by promissory note, or through the Plan. *Crabs Tr. at 9; Tyler Tr. at 223.* Owen also is charged with the knowledge that the Stock Purchase Agreement applies only if the employee designated, on the face of the Cover Sheet, that the stock was being purchased for cash or by promissory note, and that the Plan Document applies exclusively when the employee designated, on the face of the cover sheet, that the stock was being purchased through the Profit–Sharing Trust. *Def.Ex. 9 (Cover Sheet).*

72. On each of the three occasions that Owen elected to have the Profit–Sharing Trust purchase SoundView stock for his account, the "Cover Sheet" signed by Owen states that there were zero "Shares purchased solely for cash", and that there were zero "Shares purchased by Secured Promissory Note." *Def.Exs. 9, 11 & 12.* All three "Cover Sheets" signed by Owen to effectuate his stock purchases state that the SoundView stock was being "purchased through [the] Profit–Sharing Trust." *Def.Exs. 9, 11 & 12.*

73. The Stock Purchase Agreement, by its own terms, applies *only* to "cash" or promissory "note" purchases. It does not refer to purchases made through the Profit–Sharing Trust. "Cash" purchases are

those in which an employee purchases stock outright, issues a check to SoundView in payment of the purchase price of the stock, and is issued a share certificate by SoundView in the name of the employee. *Tyler Tr. at 223–224.* Stock purchases made on behalf of a Plan participant through the Plan have never been considered or construed by SoundView or its personnel as "cash" purchases. *Id.* The Stock Purchase Agreement, to which the Plan is not a signatory, has no application to the repurchase of stock held by the Plan trustees on behalf of Plan participants, including Owen.

74. The Stock Purchase Agreement and the Plan also contain substantially different procedures for valuing SoundView stock and making distributions to departing employees. The Plan (§ 4.4) vests in the Plan trustees the sole power and responsibility to value Plan assets and mandates that the trustees pay to departing employees the "fair market value" of the employee's share of those assets, as valued as of the end of month prior to the termination of their employment. *Def.Exs. 5 (§ 9.5 at p. 63), 6 (Q & A 13 at pp. 10–11).* In contrast, the Stock Purchase Agreement provides that where the employee and the SoundView Board of Directors cannot agree on the value of the departing employee's SoundView stock, an arbitration-like appraisal procedure, utilizing a third party appraiser, is to be employed to determine the "fair market value" of the stock. *Def.Ex. 9 (at ¶ 7).* Importantly, however, unlike the Plan Document, which mandates that an employee "be cashed out" as of the month-end prior to his departure, the Stock Purchase Agreement provides, with respect to shares purchased outside of the Plan, that SoundView may elect not to purchase stock at the appraised value. *Id.* In the event SoundView elects not to purchase the stock, the Stock Purchase Agreement provides that the departing employee may retain the SoundView stock, subject to the stock transfer restrictions imposed by paragraphs five

and ten of the Stock Purchase Agreement and SoundView's by-laws. *Id.*

75. The fact that Owen and all other Plan participants were permitted to and did vote the stock held in the Plan at shareholders' meetings *(Owen Tr. at 75–76)* does not establish either that Owen purchased his stock outside the Plan or that the Stock Purchase Agreement governs his stock purchases. The Plan Documents, and in particular the Summary Plan Description, specifically provide that Plan participants "will be permitted to vote any Company stock in which [their] account is invested." *Def.Exs. 6 (Q & A 9 at p. 5.), 40 (Q & A 9 at p. 7) & 41 (Q & A 9 at p. 5).*

### Owen's Testimony That He Should Be Excused From His Fiduciary Obligations Because He Was Allegedly "Excluded" from the Trustees' Administration of the Plan Was Palpably False

76. Owen testified that he was completely uninvolved and inactive as a Plan trustee, and that he never discussed anything having to do with the administration of the Plan and did not have any discussions with anyone at SoundView regarding the Plan. *Owen Tr. at 71–75, 133–134.* He so testified at deposition *(Owen Dep. at 263)* and confirmed in a Certification submitted in opposition to SoundView's motion for summary judgment *(Def.Ex. 43 at ¶ 46)* that he was completely ignorant of Valuemetrics' role and its retention by the Plan. His testimony was false.

77. The undisputed evidence and Owen's cross-examination testimony demonstrated that the Plan trustees, including Owen, delegated the day-to-day duties and responsibilities associated with the administration of the Plan to the company's Chief Financial Officer. *Tyler Tr. at 222, 246: Owen Tr. at 166–167.*

78. No credible evidence was presented by Owen to show that the Plan was not properly administered by the Plan trustees. Owen conceded that he was never barred from any trustee meeting. *Owen Tr. at 71–72.* Although no formal "trustee

meetings" were held, when matters affecting the administration of the Plan arose, these matters were discussed at partnership meetings, which Owen regularly attended, and among the trustees. *Tyler Tr. at 273: Owen Tr. at 74, 139–142.*

79. As one of the five trustees of the Plan, Owen was involved in the administration of the Plan. Owen, for example, was directly involved in the repurchase of SoundView stock at book value from the Plan for the benefit of departing employees *(Def.Ex. 42; Tyler Tr. at 234–236, 271: Owen Tr. at 131–138);* Owen regularly signed checks drawn on the Plan's account to "cash out" departing Plan participants *(Owen Tr. at 133–139; Tyler Tr. at 234–236);* Owen hired Valuemetrics for the purpose of obtaining an independent determination of the fair market value upon which the trustees could rely in establishing the repurchase price of common stock held by departing Plan members, *Def.Ex. 44;* Owen executed all necessary amendments to the Plan *(Def.Exs. 27 and 28);* and Owen regularly participated in meetings of the Board of Directors and meetings of senior SoundView executives, including the trustees of the Plan, when Plan-related matters were discussed *(Owen Tr. at 139–142).*

80. On at least one occasion. Owen expressed dissatisfaction with the Plan's choice of investment vehicles and proposed to SoundView's then Vice President of Finance that the Plan broaden the investment alternatives it offered to Plan participants. *Stipulated Fact No. 19.*

81. Owen's testimony that he had "never been told" that the Plan trustees had retained a firm called Valuemetrics to value the SoundView stock held in the Plan, and had no understanding of whether he, as a trustee, had a responsibility to value the SoundView stock held in the Plan *(Owen Tr. at 73–75),* was false. Under cross-examination, Owen conceded that *he* was the Plan trustee who initially retained the Valuemetrics firm to perform an appraisal for the Plan and who signed the first letter

of engagement with Valuemetrics on or about May 28, 1993. *Def.Ex. 44: Owen Tr. at 143–157.*

82. The engagement letter with Valuemetrics specifically recited that:

> Valuemetrics, Inc. ("Valuemetrics") is pleased to be retained by the Trustee (the "Trustee") of the SoundView Financial Group (the "Company") 401(k) Plan (the "Trust") to provide an opinion as to the valuation of the fair market value as of December 31, 1992 of the common stock of the Company upon which valuation the Trustee may rely in establishing the price for purchases and redemptions by the Trust of the common stock of the Company made pursuant to the provisions of the Trust of the Company.

*Def.Ex. 44 at p. 1.*

83. Directly above Owen's signature on the engagement letter appeared the following statement:

> The foregoing has been read, understood and approved, and the undersigned does hereby retain Valuemetrics, Inc. upon the terms and provisions contained herein.

*Def.Ex. 44 at p. 6.*

### The Plan Document Does Not Support Owen's Contention That He is Entitled To Receive The 1999 Book Value of the SoundView Stock

84. Section 9.3.3 of the Plan Document provides that "in the event that the amount of a payment required to be made on the date otherwise determined under this Plan cannot be ascertained by such date ... *a payment retroactive to such date* [here, February 29, 1996] may be made no later than sixty (60) days after the earliest date on which the amount of such payment can be ascertained ... (emphasis added)." In this case, the distribution to be made to Owen under the Plan could not be made because Owen refused to accept fair market value as determined by the trustees.

*Credibility of Deposition and Trial Testimony*

85. Owen's self-serving testimony is not credited. All issues of credibility are resolved in favor of the defendants and against Owen.

## CONCLUSIONS OF LAW

A. The Federal District Court has subject matter jurisdiction over the issues in controversy in this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(c).

B. Venue in the Southern District of New York is proper.

C. As a general matter, any plan, fund or program established by a non-governmental employer for the purpose of providing retirement benefits to employees is an "employee pension benefit plan" subject to the requirements of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). 29 U.S.C. §§ 1002(3), 1003(2).

D. Most pension plans are intended to be "qualified" plans for purposes of the Internal Revenue Code (the "Code"). A qualified plan offers several important tax advantages, including deductibility of employer contributions to the plan, tax-free accumulation of plan earnings, and advantageous tax treatment of participants' interests in the plan. In order to be treated as "qualified," a pension plan must meet a number of conditions set forth in the Code § 401, some of which are identical to the substantive requirements of ERISA.

E. The applicable Treasury regulations relating to qualified plans recognize several different types of pension plans and these distinctions are also used in ERISA. The term "profit-sharing plan" is defined under applicable Treasury regulations as a defined contribution pension plan under which an individual account is maintained for each participant and each participant's benefits are based on the contributions allocated to the account and any investment gains or losses realized as a result of the investment of such contributions. 26 C.F.R. § 1.401–1(b)(ii). A "stock bonus plan" is similar to a profit-sharing plan, but under a stock bonus plan, benefits are distributable in stock of the employer maintaining the plan. 26 C.F.R. § 1.401–1(b)(ii).

F. With certain limited exceptions that do not apply herein, ERISA preempts all state and local laws that "relate" to an employee benefit plan. ERISA § 514(a), 29 U.S.C. § 1144(a). Under this broad preemptive language, *any* state law that relates to an ERISA-covered plan is preempted, not just those laws that conflict with ERISA. *See Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990) (employee's claim was expressly preempted by § 514(a) which provides for preemption of all state laws that "relate to" an employee benefit plan covered by ERISA). Thus, Owen's claim for unjust enrichment may be preempted by ERISA to the extent that Owen relies on New York State law. *Geller v. County Line Auto Sales, Inc.,* 86 F.3d 18, 22 (2d Cir.1996). A claim asserting unjust enrichment may, however, be an "appropriate equitable remedy" in an ERISA case. 29 U.S.C. § 1132(a)(3)(B); *see Mertens v. Hewitt Associates,* 508 U.S. 248, 256–57, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993) (noting that ERISA's provision for "other appropriate equitable relief" may include a claim for restitution). We do not need to decide whether Owen's claim of unjust enrichment is preempted by or available under ERISA, because the claim, as well as the other claims set forth in Owen's Amended Complaint, is deemed to be without merit.

G. The Plan herein is an "employee pension benefit plan" subject to ERISA and is intended to be a "qualified" plan under the Code. The Plan also states that it is intended to be a profit-sharing plan with a "cash or deferred" feature.

H. To the extent that the Plan conforms with ERISA, the Plan Document governs

Owen's rights and benefits under the Plan, including the valuation and distribution of the 120,000 shares of SoundView stock held by the Plan on his behalf.

I. All of the SoundView stock held by the Plan is owned by the Plan itself, as evidenced by the fact that all shares are registered in the name of the Plan's trustees. This is also consistent with the ERISA requirement that all plan assets must be held in trust and that the trustees must have "exclusive authority and discretion to manage and control" a plan's assets. 29 U.S.C. § 1103(a).

J. There exists no independent basis for the assertion of liability against Sound-View. As a condition of membership in the Plan, all Plan participants, including Owen, agreed to look only to the "Trust Fund" for satisfaction of any claim arising from membership in the Plan. *See* Enrollment Documents, Def.Exs. 2–4.

### *Owen's Claims For Relief*

[3] K. ERISA's "Prohibited Transaction" rules, *see* 29 U.S.C. §§ 1106(a), 1108(e), are not applicable to the payment of Plan benefits to a Plan beneficiary, because the beneficiary is not a "party in interest." *See Lockheed Corp. v. Spink*, 517 U.S. 882, 892–93, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996) ("Section 406(a)(1)(D) does not in direct terms include the payment of benefits by a plan administrator. And the surrounding provisions suggest that the payment of benefits is in fact not a 'transaction' in the sense that Congress used that term in section 406(a)."). The issue of whether the trustees satisfy ERISA's Prohibited Transaction provisions if and when the Plan sells the shares

held in the Pooled Investment Fund for Owen's benefit to SoundView, is not before this court.[3]

L. The Plan expressly places the duty of valuation of Plan assets on the trustees, and gives to the trustees of the Plan "the power, to be exercised in its complete discretion ..., to construe all terms, provisions, conditions and limitations of the [401(k)] Plan...." *See* Plan Document, §§ 4.4 & 11.2. "Plan trustees are entitled to deference when the terms of the plan afford them discretionary authority over benefits." *Gallo v. Madera*, 136 F.3d 326, 328 (2d Cir.1998) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). When, as is the case here, "plan documents give the trustees the discretion to interpret plan terms, we will not substitute our judgment for theirs unless the trustees' interpretation is arbitrary and capricious." *Ganton Technologies, Inc. v. National Industrial Group Pension Plan*, 76 F.3d 462, 466 (2d Cir.1996).

M. The evidence adduced at trial showed that the Plan trustees applied a reasonable procedure for determining the value of the SoundView stock held by the Plan on Owen's behalf. The testimony of Ms. Tyler regarding the various factors she considered prior to her determination of the value of the stock illustrates that the trustees' determination of the benefits due Owen under the Plan was neither arbitrary nor capricious.

N. Owen's contention that the Plan trustees' valuation determination should be reviewed *de novo* because the trustees were allegedly operating under a "conflict

---

3. Under ERISA, purchases and sales of securities issued by SoundView in a transaction between the Plan and a "part in interest" (including a Plan sponsor such as SoundView) are prohibited unless a statutory exemption, defined in ERISA § 404(e), 29 U.S.C. § 1108(e) is available. *See* 29 U.S.C. §§ 1106(a), 1107, 1108(e); 29 C.F.R. § 2550.480e. Under this exemption, such a transaction is permitted only if it is for "ade-

quate consideration" as defined by 29 U.S.C. § 1002(18), which in turn defines "adequate consideration" as the fair market value of the stock. *See also* 29 C.F.R. § 2550.480e.

The Plan trustees have not indicated whether they will sell the SoundView common stock held in the Pooled Investment Fund for the benefit of Owen. The issue of whether they may sell the stock at book value, or any other value, is not before this court.

of interest" is without merit. The service of Plan trustees in dual roles, both as Plan trustees and as officers of SoundView, does not, without more, justify *de novo* review.

O. ERISA has rejected the common law trust rule against fiduciaries' dual loyalties. Dual roles on the part of plan trustees, as well as dual loyalties, is expressly anticipated and permitted by ERISA. This point was succinctly made in *Siskind v. Sperry Retirement Program*, 47 F.3d 498, 506 (2d Cir.1995) ("This dual responsibility is expressly envisioned under [29 U.S.C. § 1108(c)(3)], which permits a plan sponsor to appoint as trustee its own 'officer, employee, agent or other representative.' ").

P. Where trustees have a conflict of interest, the Second Circuit requires that a two-prong test be applied to determine, 1) whether the determination made by the trustees is reasonable; and 2) "whether the evidence shows that the [trustees were] influenced by such conflict." *Sullivan v. LTV Aerospace & Defense Co.*, 82 F.3d 1251, 1255–56 (2d Cir.1996); *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir.1995). Here, both prongs of the test are satisfied: the trustees' determination that Book Value was an appropriate measure of the value of SoundView common stock was reasonable, *see supra*, and Owen presented no credible evidence showing that the trustees' valuation of Owen's stock was improperly influenced by any conflict of interest on the part of the Plan trustees.

▆ Q. ERISA requires that plan trustees, as fiduciaries, act "solely in the interests" of plan participants and beneficiaries, 29 U.S.C. § 1104(a)(1). However, "[t]he fiduciary obligation to discharge duties 'solely in the interest of the participants and beneficiaries', surely [does] not obligate the trustees to pay [Owen] more than the value to which the Plan entitled him." *Allen v. Katz Agency, Inc. Employee Stock Ownership Plan*, 677 F.2d 193 198 (2d Cir.1982). The trustees must determine the "value" of a participant's benefits taking into account not only the interests of the particular participant receiving the benefit, but the interests of *all* plan participants and beneficiaries. *See Morse v. Stanley*, 732 F.2d 1139, 1145 (2d Cir.1984) ("a trustee has a duty to deal impartially with beneficiaries.... The trustee must deal even-handedly among them, doing his best for the entire trust looked at as a whole."). The use of the book value methodology to value the SoundView stock held by the Plan complied with that duty because it provided an objective and easily administrable method that could be, and was, applied uniformly to all participants whose Plan accounts held SoundView stock. Moreover, because all Plan participants acquired stock at adjusted book value, the Plan trustees reasonably determined that it was appropriate that participants also receive benefit distributions using the same methodology, particularly since the value used in the methodology did not merely represent the historical or "book" cost of SoundView assets, but was updated on a monthly basis to reflect appreciation in the value of those assets and SoundView's actual performance.

R. The credible evidence presented at trial proved that the Plan trustees complied with their fiduciary obligation to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," 29 U.S.C. § 1104(a)(1)(B).

S. Furthermore, by steadfastly adhering to the text of the Plan documents, the trustees complied with their fiduciary duty to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA]." 29 U.S.C. § 1104(a)(1)(D).

T. Owen, a Plan trustee, breached this same fiduciary duty by attempting to subvert the plain meaning of the Plan documents to secure an unwarranted benefit for himself at the expense of the remaining Plan members.

U. Owen's contention that he is entitled to receive the *current* value of the SoundView stock is contrary to the clear provisions in the Plan Document.

V. Under ERISA and the clear language of the Plan, the trustees of the Plan were required to determine the amount of the distribution payable to Owen based on the fair market value of the SoundView stock determined as of the end of the month preceding his termination of employment. the Plan. *See* 29 U.S.C. § 1104(a)(1)(D) (trustees have a fiduciary duty to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA]"); *see also, e.g., Pratt v. Petroleum Production Management Employee Savings Plan & Trust,* 920 F.2d 651, 657 (10th Cir.1990) (where "the plan document unambiguously addresses the valuation procedure ... the plan is contractually bound to honor that procedure as it existed when the plaintiff separated [from employment]."); *cf. Kay v. Thrift & Profit Sharing Plan,* 780 F.Supp. 1447, 1456–57 (E.D.Pa.1991) (profit-sharing plan trustees are required to compute former employees' plan benefits in accordance with valuation date provision of plan in effect at time employees were discharged).

W. It is not unusual for a Plan to allocate the risk of a fluctuating market by applying a valuation date of company stock earlier than the distribution date to the Plan participant. *See, e.g., Pratt,* 920 F.2d at 660. *Albanese v. Pfizer, Inc.,* 1996 WL 225192 at *5, No. 94–Civ–2223, 1996 U.S.Dist. LEXIS 7047, at *18 (D.Kan. March 19, 1996). This practice is not prohibited by ERISA, *see id.,* and is expressly provided for in SoundView's Plan Document and Summary Plan Description. Owen is contractually entitled to receive only that which he was offered by the Plan trustees following his departure from SoundView, namely a cash distribution equal to the fair market value of the stock as of the valuation date set forth in both the Plan Document and the Summary Plan Description (*i.e.* February 29, 1996). *Pratt,* 920 F.2d at 659–660, *Kay v. Thrift & Profit Sharing Plan,* 780 F.Supp. at 1457.

X. Owen is entitled to $696.000 in satisfaction of his profit-sharing Plan account. His excessive demand and subsequent refusal of the benefits offered by the Plan trustees have delayed distribution and have left the proceeds of plaintiff's Plan account commingled in the Plan's Pooled Investment Fund for a significant period of time. The Court is not free to rewrite the Plan to reallocate the risks of declining or rising markets during the time imposed on the Plan by the disagreement of the plaintiff therewith.

Y. Owen's claim that "SoundView will be unjustly enriched by virtue of buying back plaintiff's stock at anything other than its fair market value" is entirely without merit. As stated above, Owen never owned the stock, rather, the Plan purchased and owned the stock for the benefit of Owen's Plan account. While under ERISA's prohibited transaction rules, *see* ERISA § 408(e)(1), the Plan cannot sell the 120,-000 shares of stock held for Owen's benefit back to SoundView at anything other than "adequate consideration" as of the date of such resale, the price to be paid by SoundView to the Plan upon its eventual repurchase of the stock is not determinative of Owen's vested benefit entitlement under the Plan and is not an issue presently before this Court.

### INTEREST

Z. An award of prejudgment interest is appropriate in cases arising under ERISA. *See Katsaros v. Cody,* 744 F.2d 270, 281 (2d Cir.), *cert. denied,* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984).

However, "prejudgment interest is a discretionary matter for the court and should be awarded only in cases where such an award is 'fair, equitable and necessary to compensate the wronged party fully.'" *Mendez v. Teachers Insurance & Annuity Assoc. & College Retirement Equities Fund,* 982 F.2d 783, 790 (2d Cir.1992) (quoting *Wickham Contracting v. Local Union No. 3, IBEW,* 955 F.2d 831, 835 (2d Cir.), *cert. denied,* 506 U.S. 946, 113 S.Ct. 394, 121 L.Ed.2d 302 (1992)).

■ AA. There is no hint in the record of the Plan's unwillingness to pay. There was no bad faith in waiting out the plaintiff's lawsuit challenge. Payment was delayed because of Owen's claim in excess of the applicable Plan provisions. There is therefore no equity in any claim for prejudgment interest. The Plan was not enriched unjustly in the circumstances of this case. Accordingly, plaintiff will not be rewarded with prejudgment interest.

## ATTORNEYS' FEES

BB. Under ERISA, attorneys' fees and costs of the action may be awarded to either party. 29 U.S.C. § 1132(g)(1). In determining whether to grant a request for attorneys' fees, the Second Circuit has identified five factors: (1) the degree of the offending party's culpability or bad faith; (2) the ability of the offending party to satisfy an award of attorneys' fees; (3) whether an award of fees would deter other persons from acting similarly under like circumstances; (4) the relative merits of the parties' positions; and (5) whether the action sought to confer a common benefit on a group of pension plan participants. *Chambless v. Masters, Mates & Pilots Pension Plan,* 815 F.2d 869, 871 (2d Cir.1987). Although an award of attorney's fees is discretionary, the Second Circuit has held that "attorney's fees may be awarded to the prevailing party under ERISA in the absence of some particular justification for not doing so." *Birmingham v. SoGen–Swiss International Corp.*

*Retirement Plan,* 718 F.2d 515, 523 (2d Cir.1983).

■ CC. There is no basis in the record for the award of attorneys' fees sought by Owen against defendants. However, consideration of the foregoing factors strongly favors an award of costs and attorneys' fees in favor of the defendants.

DD. In bringing and conducting this litigation, Owen acted in bad faith. His testimony at trial demonstrated conclusively that the Certification he submitted in opposition to defendants' motion for summary judgment contained material statements that were inaccurate and false. Owen's deposition and trial testimony was similarly inaccurate and misleading with respect to his prior involvement in the administration of the Plan, his prior knowledge of and involvement in the valuations performed by Valuemetrics, and numerous other matters as set forth in the Additional Specific Findings of Fact. As made clear at trial, Owen, in his capacity as a Plan fiduciary, not only participated and approved the Plan's valuation process, but was directly responsible for the retention of Valuemetrics—a fact he consistently denied at both his deposition and at trial until he was confronted with the Valuemetrics retention letter signed by his own hand.

EE. In his capacity as a Plan fiduciary, Owen never once objected to the Plan's method of valuation. Owen has never attempted to obtain benefits for the Plan participants as a group—even when he was legally obligated to do so—but rather has sought to advance his own interests at the expense of the remaining Plan participants. If Owen had truly believed the valuation process employed was unfair to the Plan's participants, he was affirmative obligated to raise these concerns to his fellow fiduciaries. *See* 29 U.S.C. § 1105(a)(2)–(3). Owen not only failed to do so while he was a fiduciary, but actively participated in the implementation and execution of the Plan's valuation process of which he now purports to complain. Moreover, the arguments advanced by

Owen in support of his claims, in particular his assertion that the Stock Purchase Agreement controlled the repurchase of the shares held by the Plan on his behalf, border on the frivolous, particularly in view of the utter paucity of evidence proffered by Owen at trial to support this contention. Given the substantial sums earned by Owen during his tenure at SoundView, there is no reason to believe that he lacks the financial ability to satisfy an award of attorneys' fees.

FF. An award of SoundView and the Plan's Attorney's fees to be paid by Owen is required in this case to deter others from seeking to singularly gain pension benefits at the expense of other Plan beneficiaries.

GG. An application for allowance of counsel fees payable to defendants may be made to be entered at the foot of the Judgment upon 10 days notice and response thereto in 10 days and if allowed after due deliberation may be added by the Clerk to the Judgment as additional costs in favor of defendants.

HH. Subject to deduction therefrom of the Award of said fees to be paid by Owen, as fixed and allowed hereafter, and Court costs, plaintiff is entitled to receive in satisfaction of his profit-sharing account, on due demand and receipt tendered therefor, the amount of $696,000 payable by the SoundView 401(k) and Profit–Sharing Plan for his interest therein.

II. The complaint against the defendant SoundView Financial Group, Inc. is dismissed and the claims in the complaint asserted against the SoundView 401(k) and Profit–Sharing Plan are dismissed except as otherwise provided above.

The foregoing Opinion and Findings shall constitute the Findings of Fact and Conclusions of Law required under Rule 52(a) Fed.R.Civ.P. and Judgment shall be entered pursuant to Fed.R.Civ.P. 58.

So Ordered.

## SUPPLEMENTAL FINDINGS, CONCLUSIONS AND DECISION

### Supplemental Findings

The Court having rendered its Findings of Fact and Conclusions of Law herein, which among other things provided that

"GG. An application for allowance of counsel fees payable to defendants may be made to be entered at the foot of the Judgment upon 10 days notice and response thereto in 10 days and if allowed after due deliberation may be added by the Clerk to the Judgment as additional costs in favor of defendants.

HH. Subject to deduction therefrom of the Award of said fees to be paid by Owen, as fixed and allowed hereafter, and Court costs, plaintiff is entitled to receive in satisfaction of his profit-sharing account, on due demand and receipt tendered therefor, the amount of $696,-000 payable by the SoundView 401(k) and Profit–Sharing Plan for his interest therein."

And a hearing having been had on July 26, 1999 on the defendants' application for legal fees and related costs for services rendered; and the defendants having stipulated in conformity with the Plan, Section 15.2 that plaintiff's benefits under the Plan

shall not be subject to encumbrance or charge, or payment be in any way liable to the debts or liabilities of a Participant under the Plan or subject to attachment, garnishment, levy, execution or other legal or equitable process;

and in accordance with said provision of the Plan and defendants' said stipulation, Conclusion "HH" as ordered June 22, 1999 is modified accordingly to read:

HH (amended). Plaintiff is entitled to receive in satisfaction of his Profit–Sharing account, on due demand and receipt therefor, the amount of $696,000 without interest payable by the SoundView 401(k) and Profit–Sharing Plan for his interest therein.

And the Court having fixed and determined that the appropriate amount of the allowance of counsel fees and disbursements (other than the usual and ordinary Court costs to be taxed by the Clerk upon appropriate application) is the sum of $222,270 to be paid by the plaintiff, Arnold Owen;

And in plaintiff's opposition to defendants' application for attorneys' fees, plaintiff having submitted Exhibit A labeled "The December 31, 1998 valuation of Mr. Owen's Account" as a purported admission by defendants' counsel of a "Vested Account Balance" of $1,320,000 in plaintiff's account as of 12/31/98; and it appearing that no such admission having at any time been made by defendants' counsel and the testimony at the trial having clearly asserted that "the Plan is fairly clear in the fact that employees get cashed-out at fair market value as of the end of the month preceding their termination date" (Crabs, SM. 32 of 3/29/99); and that plaintiff is entitled only to the amount set forth in Conclusion "HH (amended)" set forth above.

### Conclusion

JJ.   The defendants SoundView Financial Group, Inc., now known as SoundView Technology Group, Inc., and the Sound-View 401(k) and Profit–Sharing Plan shall recover attorneys' fees and disbursements from Arnold Owen in the amount of $222,-270.

The foregoing Supplemental Findings of Fact and Conclusion of Law and the modifications therein of the Additional Specific Findings of Fact herein and Conclusions dated June 22, 1999, are made pursuant to Fed.R.Civ.P. 52(a).

So Ordered.

### Judgment

This action came on for trial and a supplementary hearing thereon before this Court, Honorable Milton Pollack, District Judge, presiding and the issues having been duly tried and the supplementary hearing thereon having been duly had and Decisions dated June 22, 1999 and July 28, 1999 having been duly made and filed, it is:

ADJUDGED AND DECREED:

1.   The amended complaint and each claim therein is dismissed on the merits.

2.   The plaintiff Arnold Owen is entitled to $696,000 without interest representing his vested interest as of February 28, 1996 in his profit-sharing Plan account payable by the SoundView 401(k) and Profit–Sharing Plan pursuant to termination of his employment as of March 18, 1996.   The said sum derived as a Participant under the Plan shall not be subject to encumbrance or charge, or in any way be liable for the debts or liabilities of Arnold Owen or subject to attachment, garnishment, levy, execution or other legal or equitable process.   The said sum of $696,000 without interest is payable on due demand and receipt therefor by or on behalf of Arnold Owen.

3.   The defendants SoundView Financial Group, Inc., now known as SoundView Technology Group, Inc., and the Sound-View 401(k) and Profit–Sharing Plan shall recover from Arnold Owen the sum of $222,270, together with such costs and disbursements of the action to be taxed by the Clerk and entered hereon, and shall have execution therefor.